IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| HAROLD WILLIAMS, #241897 | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 2:15-cv-584-WKW |
| | ) | |
| RICH HALLWORTH, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

**I. INTRODUCTION**

Plaintiff Harold Williams ("Plaintiff") is a former[1] inmate of the Staton Correctional Facility ("Staton") in Elmore, Alabama. He filed this action under 42 U.S.C. § 1983, alleging medical officials were deliberately indifferent to his serious medical needs. Doc. 1. Plaintiff names as defendants Corizon Medical Services, Inc. ("Corizon"), Rich Hallworth ("Hallworth"), Woodrow Myers ("Myers"), Bobby Crocker ("Crocker"), Michele Sagers-Copeland ("Sagers-Copeland"), Darryl Ellis ("Ellis"), and Domineek Guice ("Guice") (collectively "Defendants"). *Id.*; Doc. 14. Plaintiff sues defendants in their official and individual capacities. Doc. 1 at 3. Plaintiff requests injunctive and monetary relief. *Id.* at 3–8.

Defendants filed answers, special reports, supplemental special reports, and evidentiary materials addressing Plaintiff's claims for relief. Docs. 13, 14, 18, 29. Upon

---

[1] Plaintiff's current address is in Camden, Alabama. Doc. 30.

receipt of Defendants' reports, the court directed Plaintiff to file a response, including sworn affidavits and other evidentiary materials, and specifically cautioning Plaintiff that "at some time in the future the court may treat the defendants' reports and the plaintiff's response as a dispositive motion and response." Doc. 19 at 2. Plaintiff responded to Defendants' reports and materials. Docs. 22, 23, 30.

The court now will treat the Defendants' argument that Plaintiff failed to exhaust his administrative remedies before filing suit as a motion to dismiss, and it will treat the remainder of their reports as a motion for summary judgment. Upon consideration of the motions, the responses, and the evidentiary materials filed in support and in opposition to the motion, the court concludes the motion to dismiss is due to be granted, and, in the alternative, the motion for summary judgment is due to be granted.

## II. MOTION TO DISMISS

### A. Exhaustion

Plaintiff was a prisoner when he filed this lawsuit, and he challenges the conditions of his confinement when he was an inmate at Staton. Defendants argue Plaintiff failed to exhaust his administrative remedies before filing suit. Doc. 14 at 19; Doc. 18 at 5. Under 42 U.S.C. § 1997e(a), "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." "[A]n exhaustion defense . . . is not ordinarily the proper subject for a summary judgment [motion]; instead, it should be raised in a motion to dismiss, or be treated as such if raised in a motion for summary judgment." *Bryant v. Rich*, 530 F.3d 1368, 1374–75

(11th Cir. 2008) (internal quotation marks omitted). Consequently, the court treats Defendant's exhaustion defense as a motion to dismiss.

"Congress has provided in § 1997e(a) that an inmate must exhaust irrespective of the forms of relief sought and offered through administrative remedies." *Booth v. Churner*, 532 U.S. 731, 741 n.6 (2001). "[T]he word 'exhausted' has a decidedly procedural emphasis. . . one 'exhausts' processes, not forms of relief, and the statute provides that one must." *Id.* at 739. "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). The exhaustion requirement is an affirmative defense; it is not jurisdictional or a pleading requirement. *See Jones v. Bock*, 549 U.S. 199, 216 (2007); *Woodford v. Ngo*, 548 U.S. 81, 101 (2006) ("the PLRA exhaustion requirement is not jurisdictional"); *Bryant*, 530 F.3d 1374–75 & n.10. "[T]he question of exhaustion under the PLRA [is] a 'threshold matter' that [federal courts must] address before considering the merits of the case. *Chandler v. Crosby*, 379 F.3d 1278, 1286 (11th Cir. 2004). Because exhaustion is mandated by the statute, [a court has] no discretion to waive this requirement. *Alexander v. Hawk*, 159 F.3d 1321, 1325–26 (11th Cir. 1998)."[2] *Myles v. Miami-Dade County Correctional and Rehabilitation Dept.*, 476 F. App'x 364, 366 (11th Cir. 2012).

---

[2] Policy reasons for exhaustion include:

> (1) to avoid premature interruption of the administrative process; (2) to let the agency develop the necessary factual background upon which decisions should be based; (3) to permit the agency to exercise its discretion or apply its expertise; (4) to improve the efficiency of the administrative process; (5) to conserve scarce judicial resources, since the complaining party may be successful in vindicating rights in the administrative process and the courts may never have to intervene; (6) to give the agency a chance to discover and correct its own errors; and (7) to avoid the possibility that

Moreover, "the PLRA exhaustion requirement requires proper exhaustion." *Woodford*, 548 U.S. at 93. "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules [as a precondition to filing suit in federal court] because no adjudicative system can function effectively without imposing some orderly structure on the courts of its proceedings. . . . Construing § 1997e(a) to require proper exhaustion . . . fits with the general scheme of the PLRA, whereas [a contrary] interpretation [allowing an inmate to bring suit in federal court once administrative remedies are no longer available] would turn that provision into a largely useless appendage." *Id.* at 90–91, 93. The only exception to the exhaustion requirement is embedded in the text of § 1997e(a), that is, the remedy must be "available." In other words, the grievance procedure must be "'capable of use' to obtain 'some relief for the action complained of.'" *Ross v. Blake*, 136 S. Ct. 1850, 1859 (2016). The Supreme Court has held that a grievance procedure is unavailable when "it operates as a simple dead end." *Id.* Or "it might be so opaque that it becomes, practically speaking, incapable of use." *Id.* Or it is unavailable because "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

The court conducts a two-step inquiry in applying § 1997e(a). *See Turner v. Burnside*, 541 F.3d 1077 (11th Cir. 2008). First, the court considers the parties' versions of the facts, and if they conflict, takes the plaintiff's version as true. *Id.* at 1082. If, based

---

"frequent and deliberate flouting of the administrative processes could weaken the effectiveness of an agency by encouraging people to ignore its procedures."
*Alexander*, 159 F.3d at 1327 (quoting *Kobleur v. Group Hospitalization & Medical Services, Inc.*, 954 F.2d 705 (11th Cir. 1992)).

on the plaintiff's version, the claim is unexhausted, the court must dismiss the claim. *See id.* Second, if the case cannot be dismissed based on plaintiff's version and there are factual disputes, "the court then proceeds to make specific findings in order to resolve the disputed factual issues related to exhaustion. The defendants bear the burden of proving that the plaintiff has failed to exhaust his available administrative remedies." *Id.* (citations omitted).

## B. Facts Related to the Grievance Process

Sagers-Copeland avers she is a registered nurse in the State of Alabama and is employed as the Health Services Administrator at Staton. Doc. 14–2 at 1. Sagers-Copeland avers that upon arriving at any facility in the Alabama Department of Corrections, inmates are notified of the procedures and processes for obtaining medical care. *Id.* at 2. The grievance process begins when an inmate submits a Medical Grievance form to Sagers-Copeland through the institutional mail system. Sagers-Copeland responds in writing in about ten days, and the response includes written notification that the inmate may appeal by requesting a Grievance Appeal from the Health Services Administrator and returning it to the Health Services Administrator by placing the form in the sick call request box or giving it to the nurse on rounds. *Id.* at 2–3. If an inmate appeals, "the inmate may be brought in for one-on-one communication with the on-site physician, medical staff, me and/or the Director of Nursing." *Id.* at 3. Sagers-Copeland states she tries to review grievances daily and respond within ten days. *Id.* Sagers-Copeland avers that she "conducted an exhaustive service of all of the grievance documentation, including the grievance tracking documentation maintained at Staton, and did not locate a single grievance document

5

submitted by Mr. Williams during the period from January of 2012 through the present."
*Id*. Sagers-Copeland's affidavit is dated October 23, 2015. *Id*. at 7.

Ellis avers he is a registered nurse in the State of Alabama and is employed as the
Director of Nursing at Staton. Doc. 14–3. Ellis is "responsible for the day-to-day
managerial oversight of the nursing staff employed by Corizon at the facilities." *Id*. at 1.
Ellis avers that he may draft responses to grievances when Sagers-Copeland is unavailable
or out of the office. *Id*. at 2. Ellis also looked for but could find a single grievance from
Plaintiff, and he could not recall Plaintiff filing a grievance or requesting medical
treatment. *Id*.

Plaintiff does not dispute that he was notified about the medical grievance process
and the way to complete it. Plaintiff stated in his verified complaint that in about 2012, he
filed a "complaint form seeking medical assistance" with reversal of his colostomy. Doc.
1 at 4. After Crocker told Plaintiff "there was nothing that he could do to reverse the
procedure," Plaintiff "filed another complaint to the Directors of the healthcare company .
. . ." *Id*. Plaintiff stated that he "filed a medical grievance to both Mrs. Copeland and Mr.
Ellis complaining of his inadequate and depriving treatment" from Defendant Guice *Id*. at
4–5. After an appointment in March 2014, "Plaintiff filed another medical grievance form
to readdress his issue to Mrs. Copeland and Mr. Ellis, and again the Plaintiff's issue was
not addressed with treatment and again no treatment was rendered to the Plaintiff and they
did nothing but establish a pattern of denials." *Id*. at 5. In his response to Defendants'
exhaustion argument, Plaintiff stated:

> he filed at least three grievances and received no answer to either complaint.
> See **(Plaintiff's Attachment D).** I complained about not receiving answer to
> my complaints, to include why there was no tracking system, or numbers on
> the grievances to ensure accountability. **(Plaintiff's Attachment A).** Those
> requests also went unanswered.

Doc. 22 at 1. Plaintiff's filing does not include the attachments identified in his response.

In a later statement, Plaintiff asserted:

> I filed approximately three (3) grievances on or about December, 2012,
> March, 2013, and June, 2014. I did not receive a reply to either. I complained
> about not receiving answer to my complaints, to include why there was no
> tracking system, or numbers on the grievances to ensure accountability.
> **(Plaintiff's Attachment A).** Those requests also went unanswered.

Doc. 23–1 at 2.[3] Despite Plaintiff's reference to an attachment, none was filed. Plaintiff

states he then complained to Alabama Department of Corrections officials, but no one

would intervene except Lt. Sowell, who said he could not require Plaintiff be treated but

sent Plaintiff to health care officials for treatment. *Id.* Plaintiff submits no statement from

Lt. Sowell.

### C. Discussion--Exhaustion

It is undisputed that Corizon provides an administrative remedy for inmate

complaints regarding medical treatment in the form of an inmate grievance procedure, but

Plaintiff did not complete it. Plaintiff offers no support for his bare assertions that he filed

grievances but received no response. He also does not state he submitted any grievance

---

[3] Plaintiff's statement is entitled "affidavit" and appears to be notarized, but no seal is visible, as required by Alabama law. *See* Ala. Code § 36–20–72 ("For the authentication of his or her official acts, each notary shall provide a seal of office, which shall present, by its impression or stamp, the name, office, and the state for which he or she was appointed."). Under Fed. R. Civ. P. 56(e)(2) and (4), however, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . . the court may . . . consider the fact undisputed" or "issue any other appropriate order." For purposes of this Recommendation, the court treats Plaintiff's statement as sworn. In addition, Plaintiff's Doc. 30–5 is duplicative of Doc. 23–1.

appeal. He states he complained to Department of Corrections officials, but he does not submit copies of his complaints. The court determines Plaintiff therefore fails to overcome Defendant's evidence that a grievance system was available to Plaintiff, but he failed to use it. *See Woodford*, 548 U.S. at 90–91 (to exhaust administrative remedies, an inmate must comply with all steps prescribed by the grievance system); *Turner*, 541 F.3d at 1082 (court "make[s] specific findings in order to resolve the disputed factual issues related to exhaustion"); *see also Maclary v. Carroll*, 142 F. App'x 618, 620 (3rd Cir. 2005) (inmate's unsupported conclusory allegations that he filed grievances which went unanswered and unprocessed were insufficient to overcome defendants' evidence that he failed to exhaust available administrate remedies); *Brewington v. Daniels*, 2:11–CV–793–TMH–CSC, 2012 WL 6005780 at *5 (M.D. Ala. 2012) (inmate's conclusory assertion that he complied with grievance procedures but medical staff failed to timely respond to his initial medical grievance insufficient to overcome defendants' evidence showing that a grievance system was available for plaintiff's claims).

The record before the court demonstrates that an administrative remedy was available to Plaintiff during his confinement at Staton. These materials further establish that Plaintiff failed to properly exhaust the remedy prior to filing this federal civil action. It is likewise clear that Plaintiff is no longer at Staton, and his access to the grievance procedure there has ceased; thus, the administrative remedy provided by Defendants is no longer available to Plaintiff. Under these circumstances, dismissal with prejudice is appropriate. *Bryant*, 530 F.3d at 1375 n.1; *Johnson v. Meadows*, 418 F.3d 1152, 1157 (11th Cir. 2005); *Marsh v. Jones*, 53 F.3d 707, 710 (5th Cir. 1995) ("Without the prospect of a

dismissal with prejudice, a prisoner could evade the exhaustion requirement by filing no administrative grievance or by intentionally filing an untimely one, thereby foreclosing administrative remedies and gaining access to a federal forum without exhausting administrative remedies."); *Berry v. Kerik*, 366 F.3d 85, 88 (2d Cir. 2004) (footnotes omitted) (inmate's "federal lawsuits . . . properly dismissed with prejudice" where previously available administrative remedies had become unavailable). Even assuming Plaintiff satisfies the requirements of 42 U.S.C. § 1997e(a), Defendants are entitled to judgment in their favor based on Federal Rule of Civil Procedure 56.

### III. MOTION FOR SUMMARY JUDGMENT

### A. Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (per curiam) (citation to former Fed. R. Civ. P. 56 omitted; "issue" altered to "dispute" to reflect the stylistic change in the current rule). The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine [dispute] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322–24.

Defendants have met their evidentiary burden and demonstrated the absence of any genuine dispute of material fact. Thus, the burden shifts to Plaintiff to establish, with appropriate evidence beyond the pleadings that a genuine dispute material to the case exists. *Celotex*, 477 U.S. at 324; Fed. R. Civ. P. 56(e)(3) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact [by citing to materials in the record including affidavits, relevant documents or other materials], the court may . . . grant summary judgment if the motion and supporting materials--including the facts considered undisputed--show that the movant is entitled to it . . . ."); *see also Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1098 (11th Cir. 2014) (court considers facts pled in a plaintiff's sworn complaint when considering his opposition to summary judgment"). A genuine dispute of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in its favor. *Greenberg*, 498 F.3d at 1263. The evidence must be admissible at trial, and if the nonmoving party's evidence "is merely colorable . . . or is not significantly probative . . . summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986); Fed. R. Civ. P. 56(e). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice . . . ." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252). Only disputes involving material facts are relevant, and what is material is determined by the substantive law applicable to the

case. *Anderson*, 477 U.S. at 248. To demonstrate a genuine dispute of material fact, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255; *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013) ("To be sure, [plaintiff's] sworn statements are self-serving, but that alone does not permit us to disregard them at the summary judgment stage. . . . . '[c]ourts routinely and properly deny summary judgment on the basis of a party's sworn testimony even though it is self-serving.'") (citation omitted). "Conclusory, uncorroborated allegations by a plaintiff in an affidavit or deposition will not create an issue of fact for trial sufficient to defeat a well supported summary judgment motion." *Solliday v. Fed. Officers*, 413 F. App'x 206, 207 (11th Cir. 2011) (citing *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990)); *see also Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (per curiam) (conclusory allegations based on subjective beliefs are likewise insufficient to create a genuine dispute of material fact). Although factual inferences must be viewed in a light most favorable to the nonmoving party and pro se complaints are entitled to liberal interpretation by the court, a pro se litigant does not escape the burden of sufficiently establishing a genuine dispute of material fact. *Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990). Thus, a plaintiff's pro se status alone does not mandate this court's disregard of elementary principles of production and

proof in a civil case. Here, Plaintiff fails to demonstrate a requisite genuine dispute of material so as to preclude summary judgment on his claims against Defendants. *See Matsushita*, 475 U.S. at 587.

## B. Summary of Material Facts

In 2011, before Plaintiff entered the Alabama Department of Corrections, he underwent a colostomy procedure as a result of a gunshot wound to his abdomen. Doc. 1 at 4. In 2012, Plaintiff asked health services staff at Staton for help reversing the colostomy. *Id.* Plaintiff complains that Defendants violated his Eight Amendment rights by failing to refer him to an off-site medical specialist for surgical reversal of his colostomy procedure which, he alleges, resulted in a Helicobater pylori ("*H pylori*") infection. *Id.* at 4–5.

Plaintiff states that in 2013, he asked for care "due to a high risk of him possibly developing *Helicobater pylori* infection, which is and has been considered a leading cause of stomach cancer, which is a life threatening condition." Doc. 1 at 4. Plaintiff states that in May 2013 he complained to Captain Floyd.[4] *Id.* at 5. Plaintiff submitted unsworn statements by two officers, Alexander and Greenwood, who saw Plaintiff complain of pain and blood. Docs. 23–2, 23–3.[5] Alexander states he noticed blood and Plaintiff in pain, and he escorted Plaintiff to the health care unit. Doc. 23–2. Greenwood states he saw Plaintiff go to the health care unit to complain about blood in his stool and pain in his stomach, but

---

[4] Plaintiff refers to an exhibit that is a request to see Captain Floyd, but no exhibit is attached. Doc. 1 at 5.
[5] Alexander's statement is dated November 23, 2015. Doc. 23–2. Greenwood's statement is undated but was received December 15, 2015. Doc. 23–3. Plaintiff's Doc. 30–4 is duplicative of Doc. 23–2. Plaintiff's Doc. 30–3 is duplicative of Doc. 23–3.

the nurses refused to treat him and told him to put in a sick call request. Doc. 23–3. Plaintiff's wife, Barbara Moore, avers she called to complain about Plaintiff's pain and discomfort on May 4, May 8, and May 29, 2015. Doc. 23–4.[6] She states "[m]any times I was told one thing from the prison officials and something totally different from my husband." *Id.* Similarly, Plaintiff's sister, Harriet Smith, avers she called on May 17, 2015, to complain about Plaintiff's care but "was told one thing from the prison officials and something totally different from my brother." Doc. 22–1.[7] Neither Moore nor Smith identify the persons with whom they spoke.

Hallsworth and Myers were Chief Operating Officers of Corizon. Doc. 1 at 5. Sagers-Copeland, the Health Services Administrator, did not provide care directly to Plaintiff. Doc. 14–2 at 6–7. Ellis was the Director of Nursing at Staton but did not treat Plaintiff or examine Plaintiff regarding his colostomy. Doc. 14–3 at 2–3. Ellis states it was the physician who made the decision regarding colostomy reversal, and a nurse is not authorized to override the decision. *Id.* at 2. Crocker is a medical doctor licensed in Alabama and was employed as the Regional Medical Director by Corizon and its predecessor, Correctional Medical Services, until May 2015. Doc. 14–1. Guice is a certified registered nurse practitioner and was employed by Corizon at Staton during the time relevant to the complaint. Doc. 14–4. Guice personally provided medical treatment to Plaintiff; Crocker oversaw staff who provided medical care to Plaintiff; and, except for one

---

[6] Moore's statement is notarized, but no seal is visible on the court's copy. The court nevertheless treats the statement as sworn. *See supra* n.3. In addition, Plaintiff's Doc. 30–1 is duplicative of Doc. 23–4.

[7] Smith's statement is notarized, but no seal is visible on the court's copy. The court nevertheless treats the statement as sworn. *See supra* n.3. In addition, Plaintiff's Doc. 30–2 is duplicative of Doc. 22–1.

examination of Plaintiff, Crocker did not participate directly in Plaintiff's medical care. Docs. 14–1 (Crocker Aff.), 14–4 (Guice Aff.), 14–5 (Medical Records), 18–1 (Crocker Supp. Aff.), 29–1 (Crocker Second Supp. Aff.), 29–2 (Medical Records), 29–3 (Guice Supp. Aff.), 29–4 (Medical Records).

The court directed Defendants to address the following questions:

(i) whether Dr. Crocker believed it likely or unlikely that the plaintiff would recover full bowel function to the extent necessary to justify a colostomy reversal, (ii) the nature of the injury to the plaintiff's colon caused by the gunshot wound, and (iii) the precise diagnosis and recommendation of the free world surgeon at Advanced Surgical Associates.

Doc. 15. The court further directed Defendants to address Plaintiff's claims that:

(i) Despite his suffering abdominal pain and cramping, symptoms of Helicobacter plyori or *H Pylori*, beginning in May of 2013, the defendants did not test for this condition until May of 2015; (ii) Lack of proper treatment over the past few years has led to his contracting *H pylori* and leaves him susceptible to other infections; (iii) He was denied access to medical treatment from June of 2013 until June of 2014; and (iv) In May of 2015, he was refused medical treatment by medical personnel in the health care unit for complaints of blood in his stool.

Doc. 24 at 1.

## 1. Colostomy Reversal Procedure

Crocker avers that part of his duties included oversight of "utilization management," a process to manage and facilitate referral of patients to off-site medical specialists. Doc. 14–1 at 2. Crocker examined Plaintiff once, on March 22, 2013, regarding Plaintiff's colostomy, and Crocker concluded that Plaintiff was not a candidate for colostomy reversal or "take down." *Id.* at 3. Crocker avers Plaintiff told him he underwent the colostomy procedure because of trauma to his colon as a result of a gunshot wound. *Id.*

Crocker explains that a "colostomy procedure involves removing an injured and/or infected portion of the colon and creating an opening in the abdominal wall to which the colon is attached and permitted to expel gas and feces into a colostomy bag." *Id.* Based on Plaintiff's description of the wound, it appears to Crocker the procedure in Plaintiff's case:

> required the detachment of the end of the colostomy, which was then attached to the abdominal wall, forming the colostomy stoma. Some individuals refer to this process as an "end" colostomy as opposed to the more temporary colostomy, which is referred to as a loop colostomy. The loop colostomy involves merely the attachment of the "side" of the colon to the abdominal wall.

Doc. 18–1 at 2.

Before Crocker examined Plaintiff in 2013, an off-site provider at Advanced Surgical Associates examined Plaintiff regarding the propriety of a colostomy reversal. Doc. 14–1 at 4. To Crocker's knowledge, the off-site specialist did not recommend colostomy reversal. *Id*. Upon his return, Plaintiff reported the doctor said he needed to see Plaintiff's records and "it can be reversed." Doc. 14–5 at 32. Before making a final disposition, *see id.* at 33, the off-site surgical specialist recommended a test to examine the colon called a gastrogafin enema, in which a contrast agent "is introduced into the bowel (primarily, the rectum and colon) with use of an enema. At some point," Crocker avers, "it was decided that I would evaluate Mr. Williams before we decided whether to proceed with the gastrogafin enema test suggested by the off-site surgical specialist." Doc. 18–1 at 3. The medical records referred to in Crocker's affidavit support Crocker's statements. Docs. 14–1, 14–5.

Crocker testifies by affidavit that doing a colostomy reversal depends largely on a

variety of factors, including the amount of colon injured or removed, the way it healed, and

the likelihood of a successful surgery. Crocker states:

> It is well-settled among medical professionals that a colostomy procedure should not be pursued in the event of significant questions related to bowel function because an unsuccessful colostomy reversal may result in various significant complications including sepsis and/or infection. In the case of Mr. Williams, my examination confirmed that his colostomy was functioning appropriately. Given the nature of the trauma (i.e. a gunshot wound), I concluded that it was very unlikely that Mr. Williams would likely not [sic] recover full bowel function to the extent necessary to justify the colostomy reversal. In fact, I believed that a colostomy reversal would likely cause Mr. Williams a great deal of discomfort without any significant benefit.

Doc. 14–1 at 3–4. Crocker avers he did not recommend or conclude that medical staff at

Staton should stop monitoring Plaintiff's colostomy. Doc. 18–1 at 3. Crocker avers:

> During my tenure as Regional Medical Director in the Alabama Department of Corrections system, I did recommend several patients for colostomy reversal; however, those patients typically included individuals who had undergone a more temporary type of colostomy procedure or were experiencing significant complications related to their colostomy which justified the imposition of risks associated with the reversal surgery. However, at the time of my evaluation, Mr. Williams had not experienced any of these known risks from a colostomy. Moreover, I did not instruct anyone to stop providing medical supplies for his colostomy. As of the date of my last examination of Mr. Williams, it appeared that he could continue to rely upon the colostomy, which was not posing any significant risk to his overall medical status and did not unnecessarily expose him to any potential complications or injury. It should also be pointed out that I did not see any evidence of any kind that foregoing the colostomy reversal at this point would cause Mr. Williams' condition to worsen or deteriorate in any way. In sum, my decision related to Mr. Williams was based upon my understanding of his condition and what I deemed to be in his best interests.

Doc. 18–1 at 3–4.

Guice avers she provided Plaintiff medical treatment for various medical conditions,

including his colostomy and stomach complaints. Doc. 14–4 at 3. For example, in 2012,

Guice prescribed Plaintiff a stool softener when he requested it. *Id.* On March 4, 2013, Plaintiff was treated for nausea and discomfort at the site of his "stoma," which is "where the colostomy permits the connection from the colostomy bag to the colon." *Id.* at 3–4. Plaintiff was referred to a clinician, who ordered ointment for the site and medication for Plaintiff's acid reflux. *Id.* Plaintiff failed to appear for an evaluation on March 4, 2013. *Id.* at 4. The next day, a medical provider evaluated Plaintiff for reported discomfort at the stoma, but no infection was noted. *Id.* Plaintiff was referred to an off-site specialist who evaluated Plaintiff for surgery in March 2013. *Id.* Ultimately, as previously described, Crocker conducted another evaluation of Plaintiff on March 22, 2013. *Id.* Guice evaluated Plaintiff on April 11, 2013, for discomfort at the stoma site, but Plaintiff showed no symptoms of infection. *Id.* Guice reminded Plaintiff of the proper method to care for the stoma and prescribed him pain medications, though Plaintiff disagreed with Guice's medical advice. *Id.* at 4–5. Plaintiff visited with Guice in the hallway on May 1, 2013, and Guice told Plaintiff he would be referred to the site physician for further evaluation. *Id.* at 5. The site medical director evaluated Plaintiff for abdominal pain, cramping, and blood in stool on May 13, 2013, and the physician ordered various tests, including stool samples. *Id.* The samples were negative for blood, the abdominal x-ray was normal, and Plaintiff failed to appear for his follow-up appointment on June 7, 2013. *Id.* Guice saw Plaintiff on June 14, 2013, and she referred Plaintiff for further evaluation related to his stool sample. *Id.* Plaintiff again reported blood in his stool sample on June 25, 2013, but none was found in his colostomy bag, and another test was ordered. *Id.* at 6. The medical record does not indicate the results of a test. Doc. 14–5 at 14.

For about a year after June 25, 2013, Plaintiff did not voice medical complaints or receive evaluation. Doc. 14–4 at 6. Guice evaluated Plaintiff in June 2014 for his complaints of abdominal pain and poor appetite. *Id.*; Doc. 14–5 at 14. Guice "did not find any signs or symptoms of infection at the stoma site, any indications of dysfunction with the colostomy bag or any other treatable condition." Doc. 14–4 at 6. Guice discussed Plaintiff's case with the site physician, who decided to examine Plaintiff, and who discussed with Plaintiff in July 2014 why the colostomy reversal was not clinically indicated. *Id.*

## 2. Infection

Guice avers that Plaintiff never raised with her a complaint about *H pylori*. Doc. 14–4 at 2. Guice explains:

> *H. pylori* is a type of bacteria that typically lives in the stomach lining and the first part of small intestine. . . . Most cases involving treatable *H. pylori* infection do not arise until the bacteria infiltrates the stomach lining, which can affect the stomach's creation of digestive acids and is commonly noticed with symptoms of abdominal discomfort or recurrent indigestion. Within the medical community, the actual cause of the *H. pylori* infection remains the subject of debate. In this instance, it cannot be said that Mr. Williams' colostomy "causes" or has "led to" his prior diagnosed *H. pylori* infections and, based upon the infrequency of these infections, it appears that they are mutually exclusive. . . . Mr. Williams did test positive for an *H. Pylori* infection in May of 2015 and failed to comply with the specific treatment regimen prescribed for this infection.

Doc. 14–4 at 2–3. Crocker avers that although a breath test, stool test, or blood test can reveal an *H pylori* infection, his staff typically relied on a stool test. Doc. 29–1 at 1–2. Crocker avers that, contrary to Plaintiff's statement, Plaintiff's medical records show he was tested for *H pylori* before May 2015. *Id.* at 2. A stool test for Plaintiff in May 2013

was negative for *H pylori*. *Id.* Plaintiff failed to appear for follow-up testing in June 2013; Plaintiff did not voice complaints with Guice when he saw her on June 14, 2013; and she referred him to a physician to discuss the results of his specimens. Doc. 29–3 at 2. Guice states she saw Plaintiff again on June 26, 2014,[8] and Guice did not identify any symptoms or signs of infection. *Id.*; Doc. 14–5 at 14. Crocker and Guice state they cannot identify any subsequent complaints by Plaintiff until July 8, 2014. Doc. 29–1 at 2; Doc. 29–3 at 2. The medical records support Crocker's and Guice's affidavits. Docs. 29–2, 29–4; *see also* Doc. 14–5.

In the spring of 2015, Plaintiff complained about abdominal pain. Doc. 14–4 at 6. Staff other than Guice examined Plaintiff, who then tested positive for *H pylori* and was treated. *Id.* at 6–7; Doc. 14–5 at 22. Guice adds that, contrary to Plaintiff's statement that medical staff refused to see him in May 2015 for complaints of blood in his stool, staff saw him multiple times. Doc. 29–3 at 2. Crocker also opposes Plaintiff's statement that *H pylori* occurs because of "lack of treatment":

> To be clear, *H. pylori* is a bacterial infection, meaning that, at some point in time after May, 2013, Mr. Williams somehow encountered this bacteria and it entered his digestive tract. *H. pylori* bacteria originates from various sources such as food, water, utensils. It may also result from contact with a person who is carrying the bacteria. It would be impossible to identify the exact source of Mr. Williams' infection. Nevertheless, it cannot be stated that the medical staff did anything to expose Mr. Williams to or cause him to contract an *H. pylori* infection.

Doc. 29–1 at 2–3.

---

[8] Guice refers to medical records dated June 26, 2014, Doc. 29–3 at 2, but the records cited are dated June 24, 2014, and the nurse's signature on the June 24, 2014, medical record appears to be "E. Ellis, RN." Doc. 29–4 at 8. Guice instead may have in mind Doc. 14–5 at 14, cited above.

### C. Discussion—Eighth Amendment

To demonstrate an Eighth Amendment claim based on medical care, Plaintiff must show Defendants' deliberate indifference to his serious medical needs caused him injury. *See Melton v. Abston*, 841 F.3d 1207, 1220 (11th Cir. 2016); *McElligott v. Foley*, 182 F.3d 1248, 1254 (11th Cir. 1999); *see also Nam Dang by & through Vina Dang v. Sheriff, Seminole Cty. Fla.*, 871 F.3d 1272, 1280 (11th Cir. 2017). A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Melton*, 841 F.3d at 1221–22 (quotation marks and citation omitted). Pain and suffering can constitute a serious medical need. *Id.* An inmate claiming an unconstitutional delay in medical treatment "must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed." *Hill v. DeKalb Reg'l Youth Detention Ctr.*, 40 F.3d 1176, 1188 (11th Cir. 1994), *abrogated on other grounds by Hope v. Pelzer*, 536 U.S. 730 (2002). "[D]elay in medical treatment must be interpreted in the context of the seriousness of the medical need, deciding whether the delay worsened the medical condition, and considering the reason for delay." *Id.* at 1189. Deliberate indifference means the defendant had "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." *Melton*, 841 F.3d at 1223; *see also Harris v. Prison Health Servs.*, 706 F. App'x 945, 952 (11th Cir. 2017) (recognizing conflicting circuit precedent on deliberate indifference standard, but concluding the controlling standard is "more than mere negligence," not "more than gross negligence") (citing *Melton*, 841 F.3d at 1226 n.2). The Court of Appeals for the Eleventh

Circuit has held conduct constituting deliberate indifference includes, for example, medical care that is denied or delayed without explanation or for nonmedical reasons, or grossly inadequate care, or "an easier but less efficacious courts of treatment," or "medical care that is so cursory as to amount to no treatment at all." *Melton*, 841 F.3d at 1223. "On the other hand, 'a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment' does not support a claim of deliberate indifference." *Id.* at 1224 (quoting *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991).

Based on the summary judgment record, the court concludes that Defendants did not violate Plaintiff's Eighth Amendment rights. There is no evidence on which the court could conclude that any Defendant denied or delayed medical treatment without explanation or for nonmedical reasons, or provided grossly inadequate care, or "an easier but less efficacious courts of treatment," or "medical care that is so cursory as to amount to no treatment at all." *Id.* Instead, the evidence before the court demonstrates the medical personnel examined Plaintiff, monitored his colostomy, and addressed his medical complaints, including abdominal pain, infection, and his request for colostomy reversal. Plaintiff's personal disagreement with the treatment chosen is "a classic example of a matter for medical judgment" and not a constitutional violation. *See Adams v. Poag*, 61 F.3d 1537, 1545 (11th Cir. 1995) (quoting *Estelle v. Gamble*, 429 U.S. 97, 107 (1976)). Plaintiff presents no verifying medical evidence establishing the detrimental effect of a delay in treatment or showing his medical treatment created a substantial risk to his health and that these Defendants consciously disregarded it. *See Hill*, 40 F.3d at 1188. Plaintiff's

self-serving statements of a lack of due care and deliberate indifference do not create a question of fact in the face of contradictory, contemporaneously created medical records. *See Whitehead v. Burnside*, 403 F. App'x 401, 403 (11th Cir. 2010). At worst, Plaintiff received negligent medical care, and negligence is not enough to demonstrate an Eighth Amendment violation. *See Harris*, 706 F. App'x at 951–52. Because Plaintiff's substantive medical claim fails, his claim against Corizon and the other supervisors also must fail. *See Campbell v. Sikes*, 169 F.3d 1353, 1374 at n.27 (11th Cir. 1999) (holding claim against supervising psychiatrist failed where there is no underlying constitutional violation). The record is therefore devoid of evidence—significantly probative or otherwise—showing that any Defendant acted with deliberate indifference to a serious medical need experienced by Plaintiff. Consequently, summary judgment is due to be granted in favor of the Defendants.

## V. CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1. Defendants' motion to dismiss, or in the alternative, for summary judgment be GRANTED.

2. Judgment be GRANTED in favor of Defendants.

3. This case be DISMISSED with prejudice.

4. The costs of this proceeding be taxed against Plaintiff.

It is further

ORDERED that on or before August 24, 2018, the parties may file objections to the Recommendation. Any objections filed must specifically identify the findings in the

Magistrate Judge's Recommendation to which the party is objecting. Frivolous, conclusive or general objections will not be considered by the District Court. The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file a written objection to the proposed findings and recommendations in the Magistrate Judge's report shall bar a party from a de novo determination by the District Court of factual findings and legal issues covered in the report and shall "waive the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions" except upon grounds of plain error if necessary in the interests of justice. 11th Cir. R. 3-1; *see Resolution Trust Co. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989).

Dated this 6th day of August, 2018.


/s/ Terry F. Moorer
TERRY F. MOORER
UNITED STATES MAGISTRATE JUDGE